RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DaQUANN HACKETT,

*Defendant-Appellant.*

No. 12-4428

---

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:11-cr-00101-1—Donald C. Nugent, District Judge.

Argued: May 8, 2014

Decided and Filed: August 7, 2014

Before: SUHRHEINRICH, KETHLEDGE, and WHITE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

KETHLEDGE, Circuit Judge. Around 2003, at the age of 13 or 14, DaQuann Hackett helped form the LSP street gang on the south side of Youngstown, Ohio. Eight years later, a federal grand jury indicted Hackett and 22 others for RICO conspiracy and dozens of other crimes. Most of Hackett's codefendants pled guilty, but Hackett and four of his codefendants

proceeded to trial.   A jury convicted Hackett of various gang-related, weapons, and drug offenses, along with the RICO conspiracy charge.   The district court sentenced him to 440 months' imprisonment.   Hackett now appeals.   Of his many arguments, only one has merit: that Hackett's mandatory-minimum sentence on a firearms count was imposed in violation of the Supreme Court's later decision in *Alleyne v. United States*, 133 S.Ct. 2151 (2013).   We therefore affirm Hackett's convictions but remand for resentencing.

I.

A.

LSP was named after three streets—Laclede, Sherwood, and Parkview—in the neighborhood where its members lived.   The original members, including Hackett, Derrick Johnson, and Terrance Machen, grew up together, "played ball together," and their "families were very [] close."   Over time, LSP grew in size.   Sometimes the gang initiated new members through a group beating, a process known as "jumping in."   But not everyone who "hung around" the gang was a member.   Some people, called "associates," were permitted to sell drugs in the neighborhood.   Other hangers-on, called "flunk[ies]," performed menial tasks such as purchasing bullets for the gang.

LSP's focus was drug trafficking.   Although members did not split the profits from their drug sales, they did supply each other with drugs.   Hackett was the gang's crack supplier, and managed an abandoned house from which gang members sold drugs.

Hackett "had the most say so" in the gang.   One witness testified that "[e]verything revolved around" Hackett—"the drugs, the guns, [and] the people he was around."   The gang otherwise had an informal hierarchy based on "respect."   Members earned respect by "putting in work," which sometimes meant shooting members of rival gangs.   Generally, "anything illegal" got respect; and the more violent a member was, the more respect he got.

Violence was important because LSP competed with rival gangs (in particular, the Circle Boyz) for the neighborhood drug trade.   LSP's violence—drive-by shootings, fights with other gang members, and so on—"sen[t] a message to other gangs to stay away" from LSP's territory and to steer clear of its drug business.   LSP members sent the same message through their

MySpace pages, on which they posted pictures of themselves posing with guns and bulletproof vests, displaying LSP tattoos, and making hand signs that signaled their gang affiliation. In short, LSP's members protected the gang's violent reputation; the gang's reputation protected its territory; and the territory allowed gang members to make money by selling drugs.

B.

LSP members "didn't get along" with a neighborhood youth, Sherrick Jackson, who lived with his mother, Deborah Newell. In the early morning hours of October 16, 2008, Derrick Johnson (an LSP member) and Dominique Callier (an LSP associate) opened fire on Newell's house. Two bullets went through the upstairs window; one "flew past" the head of Newell's daughter, Shalaya Jackson. Another two bullets passed through an outside wall and into a couch where Newell's niece, Cierra Mann, usually slept. The shooters ran back across the lawn and jumped into a black car parked on an adjoining street. Then the car sped away.

Several weeks later, another shooting took place. Shalaya and Mann were walking from Newell's house to a corner store when they saw Hackett drive past the house. Shalaya shouted to Newell to "be careful" because "Hackett just rolled up the street." Hackett made a U-turn and drove back to Newell's house. He got out of his car, confronted Newell, and demanded to know why she had told the police that he had been involved with the earlier shooting. Newell responded that Hackett had been driving the black getaway car; Hackett said he had "nothing to do with nothing." Then Newell started screaming at Hackett. Newell's other daughter, Shayla Perkins, ran to get her father, Sherman Perkins, who lived nearby.

The confrontation escalated. Sherman Perkins "came running up the street," pistol in hand. He waved the gun in Hackett's face, yelling at Hackett to "stay away from my family." Rather than retreat, Hackett flagged down an approaching car. When the car stopped, Hackett said something to the driver and then reached for a gun on the front seat. The driver resisted. Hackett wrestled the gun from the driver, wheeled toward Perkins, and fired, hitting Perkins and dropping him to the ground. The two men exchanged gunfire. Altogether, Hackett shot Perkins twice in the stomach and once in the arm; Perkins shot Hackett once in the stomach. Both men survived.

After the shooting, Newell's landlord forced her family to move, saying they were a danger to her neighbors. But the family's conflict with LSP continued. About four months later, around 4 a.m., someone threw a brick through the front window of Newell's new home. A Molotov cocktail followed, though the bottle bounced off the window without catching fire.

Later that same day, Newell was sitting on her neighbor's front porch when a friend came by and told Newell to "be careful. They are around the corner loading up." Newell's son, Sherrick Jackson, was standing in her front yard. The "next thing" Newell knew, "cars came screeching around the corner." The cars stopped and their passengers got out and started shooting. The shooters included Kerns, Callier, and another LSP member, Edward Campbell. Their bullets hit Sherrick in the ear and a bystander in the foot. The shooters fled.

C.

Reuben Robinson was a confidential informant who assisted the Youngstown Police Department in its investigation of LSP. Robinson was a former crack addict who could tell when someone was "geeked up" and looking for drugs. As an informant, Robinson would follow these people to drug houses, where Robinson himself would make controlled purchases of crack.

One of those houses was Hackett's drug house, which served between 20 and 30 customers a day. Typically, buyers would knock on the rear door, and Hackett or an associate would answer. Eventually, to accommodate "the high volume of traffic . . . they would have you slide the money in a slot on the door and then hand you the product out." Robinson was allowed inside the house, however, because he bought "volume dope." During his visits, Robinson noticed security cameras around the house's perimeter and a 9mm pistol on the kitchen counter. He also saw a cooking pot, baking soda, and a tube—all commonly used to cook crack.

When he arrived at Hackett's drug house on April 13, 2010, Robinson was wearing a wire. Hackett told him that someone was "snitching" and that everyone who came to the house would be searched. Robinson let Hackett search him because he "didn't want to escalate the situation" and "thought it would be a simple search." Instead, the search was "quite extensive," reaching "underneath the shirt, trying to get down the pants." Hackett found the wire. Derrick Johnson and another LSP member, Terrance Royal, were also at the house. Robinson was

"outnumbered, caught with my drawers down so to speak." Hackett asked Robinson what the wire was. Robinson told him it was a monitor for his irregular heartbeat.

Hackett was unconvinced. He ordered Johnson and Royal to gather up all the drugs. Robinson spoke a password into the wire to let his handlers know he was in trouble. Then Hackett, Johnson, and Royal began severely beating and kicking Robinson, dragging him down the back steps and towards a nearby garage as they did so. Robinson thought they would shoot him once they got there: "the guy next door had dogs, and they barked" so that "no one can see or hear anything." Royal likewise testified that, once they got Robinson behind the garage, "[e]ither we was going to keep beating him up or probably [he] was going to get shot." Robinson clung to a tree in the yard until the police arrived. His assailants ran away.

D.

A jury thereafter convicted Hackett of RICO conspiracy in violation of 18 U.S.C. § 1962(d), two counts of Violent Crimes in Aid of Racketeering (VICAR) in violation of 18 U.S.C. § 1959(a)(5), retaliation against a government witness in violation of 18 U.S.C. § 1513(a)(1)(B), and various other weapons and narcotics charges. The district court sentenced Hackett to a total of 440 months' imprisonment. This appeal followed.

II.

A.

Hackett first presents a *Batson* claim. During *voir dire*, the government exercised a peremptory strike against Juror 22, one of two African-Americans in the jury pool. Hackett challenged the strike under *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court denied Hackett's motion. Hackett argues that the court thereby deprived him of his right to a race-neutral jury selection.

"We review a district court's determination of a *Batson* challenge with great deference, under a clearly erroneous standard." *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003) (quotations and citations omitted). A district court considers *Batson* challenges in three steps. First, the challenging party must establish a prima facie case of discrimination. *United*

*States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008).  Then, "the burden shifts to the [proponent of the strike] to articulate a race-neutral explanation for striking the juror[] in question." *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991) (plurality opinion).  Finally, the trial court must determine whether the proffered explanation is a pretext for discrimination.  *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).  "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Id.*

We skip to the second step here.  The government offered two race-neutral reasons for the strike.  First, Juror 22 responded to a question about his ability to be fair by saying that "I feel like if it is like evidence, like 99 percent that they give me, I am going to need a hundred[.]"  (R. 687 at 177).  After the court's clarification that the standard is "not a hundred percent," Juror 22 said that he could follow the law.  But the government noted that "once [Juror 22] reached the box, . . . he pretty much couldn't wait to get out what he wanted to say."  Second, the government said that Juror 22's "body language" suggested that he "did not want to be a juror in this case[.]" (R. 688 at 6-7).

The court accepted those reasons and found no evidence of pretext.  The court added that Juror 22 "appeared to be sound asleep yesterday, not paying attention while he was sitting there." The court's denial of Hackett's *Batson* challenge was not clearly erroneous.

B.

Hackett next challenges his VICAR conviction for the attempted murder of Sherman Perkins during the shootout in front of Newell's house.  VICAR prohibits "attempting or conspiring to commit murder" for "the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(5).  Hackett argues that there was insufficient evidence that he shot Perkins for the purpose of "maintaining or increasing" his position in LSP, which is the racketeering enterprise at issue here.  We affirm unless no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

As an initial matter, the government argues that a jury could find the purpose element met simply because Hackett's decision to shoot Perkins was a "direct result" of LSP's conflict with

Sherrick Jackson.  But that is an argument about causation, not purpose.  And the government otherwise does not explain why proof of causation amounts to proof of purpose on the record here.  The government's first argument is meritless.

That leaves the question whether the circumstances of the Perkins shootout would otherwise allow a jury to find that Hackett shot at Perkins for the purpose of maintaining Hackett's position in LSP.  We agree with the Ninth Circuit that VICAR does not extend "to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang[.]"  *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008).  Otherwise, in gang cases, the purpose element would be nearly a tautology.  Nor is it enough if the defendant's gang-related purpose was "merely incidental" to his action.  *Id.* at 969.  But neither is the government required to prove the defendant acted "solely" or "primarily" for a gang-related purpose.  *See id.* at 965-66 (collecting cases from five circuits).  Instead, in this case, as in an analogous one, we conclude that VICAR's "purpose" element is met if the jury could find that an "animating purpose" of the defendant's action was to maintain or increase his position in the racketeering enterprise.  *Cf. United States v. Faulkenberry*, 614 F.3d 573, 586 (6th Cir. 2010).

Here, a jury admittedly could have found that Hackett acted solely in self-defense when he shot Perkins:  Hackett drove to Newell's house unarmed, and retrieved a gun and fired it only after Perkins brandished one first.  But a rational jury could have found that Hackett was animated by another purpose as well—or even a different one altogether.  When Perkins waved his gun and demanded that Hackett stay away from Perkins's family, Hackett could have simply complied and walked away.  (That is true, at least, when viewing the record in the light most favorable to the jury's verdict.)  But instead Hackett went to extraordinary lengths to fight back: he flagged down a passing car, wrestled with its driver for the gun in the front seat, and then wheeled and fired the first shot at Perkins.  One is entitled to ask why.

The trial record provides a rational answer.  Hackett stood atop LSP's hierarchy; and according to the testimony of numerous witnesses, LSP's members were expected to retaliate against anyone who disrespected them.  Perkins was certainly disrespecting Hackett during this encounter; and the jury could have reasonably inferred that, if Hackett had submitted to Perkins's

demands—while Perkins was waving a gun at him, on the gang's own turf, in plain view of whoever was around—Hackett would have jeopardized his leadership position with the gang. Indeed, the jury could have reasonably found that self-preservation was not a purpose of Hackett's actions at all—since as a result of them, quite foreseeably, he received a gunshot wound in the stomach. In sum, it would have been relatively easy, and safer too, for Hackett simply to comply with Perkins's demand to leave his family alone. But instead Hackett went to great lengths to comply with the gang's code of conduct. Thus, on this record, the jury was entitled to find that Hackett shot Perkins to maintain his position with the gang.

C.

Hackett also challenges the sufficiency of the evidence supporting his convictions for the attempted murder of a government informant, Reuben Robinson. Hackett was charged with attempting to murder Robinson, in violation of 18 U.S.C. § 1513(a)(1)(B), in retaliation for Robinson's decision to provide information to law enforcement. A second VICAR count charged Hackett with attempting to murder Robinson to maintain or increase Hackett's position in LSP, in violation of 18 U.S.C. § 1959(a). Both counts required the government to prove that Hackett was guilty of attempted murder under Ohio law. Hackett argues that the evidence at trial established only his intent to assault Robinson, not murder him.

Under Ohio law, a defendant is guilty of attempted murder if he "engag[ed] in conduct that, if successful, would result in purposely causing the death of another." *State v. Williams*, 922 N.E.2d 937, 942 (Ohio 2010) (citing Ohio Rev. Code § 2903.02(A)). The "only practical difference between attempted murder and felonious assault through causing serious physical harm is whether the defendant intended to kill the victim[.]" *State v. Deanda*, 989 N.E.2d 986, 992 (Ohio 2013).

Here—at a residence that Hackett controlled—Hackett, Johnson, and Machen hauled Robinson outside and beat his face, back, and legs. Hackett and his accomplices ripped off most of Robinson's ear, knocked his bottom dentures out, dislocated his lower jaw, bruised his ribs, and kicked him so much that, in Robinson's description, his face was unrecognizable. And all the while—with Johnson holding a pistol in one hand—Hackett and his accomplices tried to drag Robinson towards a nearby garage, where the noise from a neighbor's dogs would conceal

Robinson's screams and the gunshot that, Royal later testified, was likely to follow. The attack ended only when the police arrived; and Robinson did not leave his hospital bed for two weeks afterward. This evidence allowed the jury to find that Hackett intended to murder Robinson.

D.

Next, Hackett challenges his sentence on Count 4 of the indictment for using or carrying a firearm "during and in relation to" his attempted murder of Sherman Perkins, in violation of 18 U.S.C. § 924(c)(1)(A). This section imposes a five-year mandatory-minimum sentence. *See id.* § 924(c)(1)(A)(i). The mandatory-minimum increases to seven years "if the firearm is brandished," and 10 years "if the firearm is discharged." *Id.* §§ 924(c)(1)(A)(ii), (iii).

Hackett's presentence report recommended a 10-year sentence under the discharge subsection. (PSR ¶ 125). Hackett objected to this recommendation on the ground that the government had not alleged discharge in the indictment. (R. 707 at 17-18). The district court denied Hackett's objection (and his later motion to correct his sentence) because the evidence at trial showed that Hackett had, in fact, fired a gun at Perkins. (R. 708 at 1). Hackett now argues that the court's decision to sentence him under the discharge subsection was an improper variance from the terms of the indictment.

A variance "occurs when the charging terms of the indictment are unchanged," but the jury convicts the defendant based on "facts materially different from those alleged in the indictment." *United States v. Miller*, 734 F.3d 530, 537 (6th Cir. 2013) (internal quotations omitted). There was no variance here: the indictment alleged and the jury found that Hackett had used or carried a firearm "during and in relation to" his attempted murder of Sherman Perkins, in violation of 18 U.S.C. § 924(c)(1)(A). At this level of generality, the indictment and verdict were consistent.

But more problematic is what the government did not allege. At the time of Hackett's sentencing, brandishing and discharge were thought to be mere sentencing factors under § 924(c), which the government could omit from the indictment and the judge (rather than a jury) could find by a preponderance. *See, e.g., United States v. Thompson*, 515 F.3d 556, 564 (6th Cir. 2008). But all that changed when the Supreme Court decided *Alleyne*. There the Court held that,

under the Sixth Amendment, "any fact that increases the mandatory minimum" for an offense is an "element" of that offense, and hence must be charged in the indictment and found by a jury beyond a reasonable doubt. 133 S. Ct. at 2155, 2161.

Hackett's discharge of the firearm (when he shot Perkins) increased his mandatory-minimum sentence under § 924(c). The discharge was therefore an element of his § 924(c) offense, which, Hackett says, the government never alleged in the indictment and the jury (as opposed to the judge) never found. The government concedes as much. But the government contends that the absence of a jury finding was harmless because, had the jury been asked whether Hackett discharged his weapon at Perkins, they surely would have found he did; indeed, Hackett did not even dispute at trial that he shot Perkins. (Instead, as discussed above, Hackett disputed his motivation for doing so.)

But that argument leaves unaddressed the absence of a discharge allegation in the relevant count of the indictment. Indeed the government's argument only makes the indictment problem worse. "A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008) (quotation omitted). Here, the relevant count of the indictment charged only that Hackett "use[d] and carr[ied]" a firearm during and in relation to the predicate crime of violence, not that he "discharged" the firearm as well. And post-*Alleyne*, "use and carry" and "discharge" are two different offenses under § 924(c). *United States v. Yancy*, 725 F.3d 596, 602 (6th Cir. 2013). Thus, we would ourselves effect a constructive amendment of the indictment if, by means of a harmless-error analysis, we allowed Hackett to be convicted of a discharge offense when the indictment charged him only with a use-or-carry one. And constructive amendments are never harmless error. *Kuehne*, 547 F.3d at 683. We therefore vacate Hackett's sentence on this count and remand for resentencing.

E.

Finally, Hackett argues that the district court erred in calculating his advisory Guidelines range when it applied a four-level leadership enhancement under § 3B1.1(a). This enhancement

applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants[.]" U.S.S.G. § 3B1.1(a). Hackett argues that there was insufficient evidence that he was a leader of LSP. We review the district court's application of this enhancement for clear error. *United States v. Washington*, 715 F.3d 975, 982-83 (6th Cir. 2013).

Ample evidence supports the enhancement. First, LSP member Terrance Royal testified that Hackett "had the most influence in LSP" and "the most say so." Royal also testified that Hackett oversaw Royal's initiation into LSP, which took place in the backyard of Hackett's drug house. Second, a confidential informant, Antwain Blackmon, testified that he saw Hackett direct other gang members, and that "the drugs, the guns" all "revolved around [Hackett]." Hackett characterizes Blackmon's testimony as "pure speculation," but Blackmon testified that he based his opinion on "how things ran [and] how people fell in line[.]" Third, several witnesses testified that Hackett supplied LSP's members with crack; and the government's expert, Detective Lambert, testified that "the guy who . . . brings drugs in" is "very important" to the gang. The district court did not clearly err in finding that Hackett was a leader of LSP within the meaning of § 3B1.1(a).

\* \* \*

We affirm Hackett's convictions, vacate his sentence on Count 4, and remand the case for resentencing on that count.