NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0457n.06

Nos. 15-1613, 15-1672, 15-1674, 15-1677, 15-1692

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Aug 04, 2017 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| LEON GILLS, ALEXANDRA NORWOOD, | ) | UNITED STATES DISTRICT |
| JOHNATHAN OLDHAM, JONATHAN WALKER, | ) | COURT FOR THE EASTERN |
| and JATIMOTHY WALKER, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |

Before: DAUGHTREY, KETHLEDGE, and STRANCH, Circuit Judges.

KETHLEDGE, Circuit Judge. Murda Ville was a street gang that operated out of the Howard Estates, a housing project in Flint, Michigan. The defendants—all members of the gang—were convicted under the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Violent Crimes in Aid of Racketeering Act (VICAR). Of the defendants' many challenges to their convictions and sentences, none has merit. We affirm.

I.

Founded in 2002, Murda Ville has cycled through many names over the years: Hot Boys, Howard Boys, Howard Estate Hustlers, 858 Gang. But several things have remained constant. Gang members deal drugs; they do so in and around the Howard Estates; they prevent anyone else from dealing there; and they take extraordinary efforts to protect their individual and collective reputations for violence.

In 2012, the Government indicted 12 members of the gang, charging them with (among other things) a RICO conspiracy in violation of 18 U.S.C. § 1962(d) and VICAR offenses in violation of 18 U.S.C. § 1959. Six defendants pled guilty. Five defendants were convicted at trial. They now appeal.

II.

A.

The defendants first argue that their RICO and VICAR convictions are based on insufficient evidence. Evidence is sufficient to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

1.

A defendant violates RICO if he "conduct[s] or participate[s], directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity[,]" or conspires to do so. 18 U.S.C. § 1962(c) and (d). Here, the Government charged the defendants with a RICO conspiracy. The Government therefore needed to prove four elements: agreement, to conduct or participate, in an enterprise, through a pattern of racketeering activity. *See Salinas v. United States*, 522 U.S. 52, 62-63 (1997).

a.

Norwood, Oldham, and Jonathan Walker contend that there is insufficient proof that Murda Ville was an enterprise. RICO defines "enterprise" to include "any union or group of individuals associated in fact[.]" 18 U.S.C. § 1961(4). A group qualifies as an association-in-fact if it has "three structural features": a common purpose, that members pursue through

coordinated effort, over a period of time long enough to allow them to commit multiple acts of racketeering. *Boyle v. United States*, 556 U.S. 938, 946 (2009); *see also United States v. McGill*, 815 F.3d 846, 930-31 (D.C. Cir. 2016). Under that test, other circuits have held that street gangs can be enterprises. *See, e.g., McGill*, 815 F.3d at 930-31; *United States v. Ramirez-Rivera*, 800 F.3d 1, 19 (1st Cir. 2015); *United States v. Kamahele*, 748 F.3d 984, 1003-05 (8th Cir. 2014). We agree.

Here, several prosecution witnesses testified to Murda Ville's purposes, coordinated efforts, and longevity. According to former members, the gang's primary purpose was to facilitate individual members' drug dealing. Related secondary purposes included maintaining exclusive control over the Howard Estates (so that only members could deal there), and preserving the gang's violent reputation (so that members would not be cheated by customers or attacked by rivals). The gang pursued those goals through coordinated efforts. Members pooled their money to buy drugs and took turns servicing customers. They armed themselves with jointly-owned weapons and patrolled the Howard Estates, banding together to assault or kill rivals found on their territory. And they "watch[ed] each other['s] back[s]" and "r[o]de for each other," meaning that when an individual member was disrespected or threatened, other members helped him retaliate, so as to preserve his (and the gang's) reputation for violence. Finally, former members testified that the gang existed for more than a decade—ample time in which to commit multiple acts of racketeering. *See Ouwinga v. Benistar 419 Plan Servs.*, *Inc.*, 694 F.3d 783, 794-95 (6th Cir. 2012).

Norwood and Oldham have several responses, none of which are convincing. They first point out that "Howard Boys" could refer to all men who lived in the Howard Estates, rather than to a specific street gang. But several witnesses testified that the Howard Boys were a gang. The

defendants next assert that, even if they called themselves a gang, they functioned as free agents, with each dealer keeping his own profits. But as noted above, Murda Ville's members jointly purchased drugs, defended their territory, and protected the gang's violent reputation. That coordination makes them an enterprise—regardless of whether they shared profits. *See Kamahele*, 748 F.3d at 1004; *cf. United States v. Hackett*, 762 F.3d 493, 497, 500 (6th Cir. 2014) (describing a gang whose members did not share profits as a "racketeering enterprise"). The defendants also assert that Murda Ville did not have the "hallmarks" of an organization: "hierarchy, meetings, by-laws[,] or dues collections." Norwood's Br. at 27. But *Boyle* expressly held that none of those things are necessary to be a RICO enterprise. 556 U.S. at 948. Finally, the defendants say that the only evidence that Murda Ville was an "enterprise" is that its members committed "racketeering activity," which blurs the distinction between two elements of a RICO offense. But again, former gang members testified not only about the defendants' crimes, but also about the gang's common purposes, which would allow jurors to infer that the defendants acted to further those purposes. *See Ouwinga*, 694 F.3d at 794-95. Hence there was sufficient evidence that Murda Ville was an enterprise.

Norwood also contends that his involvement with the gang ended in 2006, at which point, he says, the gang was not yet an enterprise. But gang members were dealing drugs together in 2006. They were also sharing weapons, jointly defending the Howard Estates from rival gangs, and collectively retaliating against anyone who disrespected them. Indeed, Norwood personally did all those things before he was incarcerated in 2006. Thus, there was sufficient evidence that Murda Ville was an enterprise when Norwood was part of the gang.

Relatedly, Jatimothy Walker argues that the trial evidence improperly varied from the indictment because the Government proved multiple conspiracies, not one overarching

enterprise. But a Government witness identified each of the defendants as members of the same gang. That is sufficient evidence that they were part of a single enterprise—even if they belonged to different factions or subsets of the gang. *See, e.g., United States v. Fernandez*, 388 F.3d 1199, 1222-23 (9th Cir. 2004) (collecting cases). Thus, a jury could find that Murda Ville was a single enterprise here.

b.

Oldham also contends that there is insufficient proof that his racketeering acts were "related to the illegal purposes of the enterprise." Oldham's Br. at 68. If a defendant joins an enterprise but commits (or agrees to commit) racketeering acts that are not related to the purposes of the enterprise, then he has not violated RICO. *United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000); s*ee also United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014). As noted above, Murda Ville's purposes were to facilitate drug dealing, control the Howard Estates, and maintain the gang's violent reputation. And the Government presented evidence that Oldham dealt drugs, attempted to murder a member of a rival gang, and murdered a man whose brother had threatened Gills. A rational jury could find that all of those acts were related to the gang's purposes.

c.

Jatimothy Walker contends that there is insufficient proof that he agreed to a pattern of racketeering activity. A "pattern" requires "at least two [predicate] acts[.]" 18 U.S.C. § 1961(5). And "racketeering activity" includes a host of state-law crimes, such as "murder" and "dealing in a controlled substance[.]" *Id.* at § 1961(1). A defendant can agree to a pattern of racketeering activity without committing any predicate acts himself. *See, e.g., Salinas*, 522 U.S. at 66. But when he does commit predicate acts, that is sufficient proof that he agreed to commit them.

*United States v. Lawson*, 535 F.3d 434, 445 (6th Cir. 2008). Here, witnesses testified that Walker murdered a man named Marion Hardy and dealt drugs on a daily basis. Hence a rational jury could find that Walker in fact committed—and thus agreed to commit—at least two racketeering acts.

2.

The defendants also argue that their VICAR convictions are based on insufficient evidence. A defendant violates VICAR if he commits or attempts murder "for the purpose of . . . maintaining or increasing [his] position in an enterprise engaged in racketeering activity[.]" 18 U.S.C. § 1959(a)(1) and (5). To establish VICAR's purpose element, the Government need not prove that the defendant "acted solely or primarily for a gang-related purpose." *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) (internal citation and quotation marks omitted). Instead, the purpose "element is met if . . . an animating purpose of the defendant's action was to maintain or increase his position" in the gang. *Id.* (internal citation and quotation marks omitted).

a.

One of Gills's VICAR convictions is for aiding and abetting the attempted murder of a man named Charles Orr. Orr was a one-time member of Murda Ville who left the gang—and fled Flint—after killing fellow member Matthew Oldham, Johnathan Oldham's brother. Years later, Orr returned to Flint to visit his sister. While Orr was walking outside her apartment, Gills drove by in a brown minivan, and two passengers sprayed Orr with bullets, hitting him six times.

Gills first contends that there is insufficient evidence that he aided and abetted the shooters. A defendant is guilty of aiding and abetting when he "takes an affirmative act in furtherance" of an offense "with the intent of facilitating the offense's commission." *Rosemond*

-6-

*v. United States*, 134 S. Ct. 1240, 1245 (2014). Here, Gills drove the shooters to, during, and from the drive-by. That is an affirmative act. And a jury could easily find that Gills intended to help kill Orr. Orr had murdered a member of Murda Ville. Under the gang's code, that meant the gang needed to retaliate against him. And when Orr returned to Flint, Gills showed up at his sister's apartment, with two other gang members, both of whom were armed. Perhaps, as Gills asserts, that was a mere coincidence. But a jury could conclude otherwise—that Gills knew Orr was at his sister's, and drove there intending to avenge Oldham. Thus, there was sufficient evidence that Gills aided and abetted the attempted murder.

Gills also contends that the Government failed to prove VICAR's purpose element. As noted above, Murda Ville expected its members to retaliate violently when someone disrespected or threatened a fellow member. Indeed, the gang's motto—"one bust and we all bang"—reflected that expectation. And if members failed to live up to the motto, they were viewed as "soft" or "weak." A failure to attack Orr in particular would have been especially unacceptable, given that he had betrayed Murda Ville by killing a fellow member and then evaded the gang for years after. A rational jury could therefore find that Gills attempted to kill Orr, at least in part, because he wanted to preserve his standing in the gang.

Gills's other VICAR conviction is for the attempted murders of four people who were friends of Jonathan Wilson. Gills's girlfriend was a woman named Crystal, who had previously dated Wilson. One day, Wilson came to Crystal's apartment and found her and Gills in bed together. Wilson threatened Gills with a gun, and the two argued before Gills stormed off. Later that day, Gills and another gang member went hunting for Wilson. They drove to a nearby store, where they spotted a van that Wilson frequently borrowed from a friend. Soon, four people—

none of them Wilson—walked out of the store and got into the van. Gills made eye contact with them, and then began shooting, hitting two of them.

Gills again contends that there is insufficient proof that he had a gang-related purpose. He shot at the van, he says, because he was angry with Wilson and took it out on his friends. But a jury could conclude that was not Gills's only motive. Murda Ville's reputation for violence depended on each of its members maintaining their individual reputations. The gang therefore expected that members would respond violently, even to minor slights. After Gills left Crystal's apartment, he called a fellow gang member and told him that he had been "disrespected." Once Gills did that, he needed to respond with force, or else risk being seen as "soft." Moreover, the manner in which Gills responded could convince a jury that he sought to preserve his standing in the gang. He brought a fellow member along with him to witness his act of violence. *See Kamahele*, 748 F.3d at 1008. He stared down Wilson's friends, and then shot at them in "broad daylight," so that they—and everyone else in the neighborhood—would know exactly who did it. *See id.* And he later bragged about the shooting to other Murda Ville members. *See United States v. Farmer*, 583 F.3d 131, 142 (2d Cir. 2009). A reasonable jury could conclude that Gills had a gang-related purpose.

b.

Norwood's VICAR conviction is for the murder of Jonathan Parker. Parker had a long-standing feud with a man named Eddie Williams—an older drug dealer who was not a member of Murda Ville, but served as a mentor to many younger members of the gang. One day, Williams heard that Parker was hanging out near the Howard Estates. He called a Murda Ville member and offered to pay him to kill Williams. Norwood was there when the other member got

the call and volunteered to take the job himself. He then tracked down Parker, shot him nine times, and fled as Parker bled out in the street.

Norwood contends that he killed Parker for money, not to maintain or increase his standing in the gang. For at least four reasons, however, a rational jury could find that he had both purposes. First, as a former Murda Ville member testified, the most respected members of the gang were those who were the most violent. Thus, a cold-blooded, murder-for-hire was likely to raise Norwood's status. Second, this murder was requested by a long-time friend of the gang. Other members were therefore especially likely to laud Norwood for this crime. Third, like Gills, Norwood committed his crime in public, in broad daylight, while fellow gang members looked on. That suggests that he was trying to impress his gangmates. *See Kamahele*, 748 F.3d at 1008. And like Gills, Norwood talked openly about the murder afterward, which would be odd if his motives were only financial. Finally, Williams offered to pay Norwood just $2,000. A jury could conclude that, standing alone, that would not have been enough to convince Norwood to commit a capital crime. *See United States v. Whitten*, 610 F.3d 168, 180 (2d Cir. 2010). Thus, there is sufficient evidence that Norwood had a gang-related purpose.

Relatedly, Norwood argues that VICAR is unconstitutionally vague as applied to him. Just like the plain text of a statute, a court's interpretation of a statute can provide fair notice of what the statute prohibits. *See Skilling v. United States*, 561 U.S. 358, 404 (2010). *Boyle* provides fair notice that a street gang can be an "enterprise." 556 U.S. at 948. And *Hackett* provides fair notice that "position in an enterprise" refers not only to a formal role with a title, but also to a defendant's reputation among his gangmates. 762 F.3d at 497, 500-01. Thus, Norwood's constitutional challenge to VICAR fails.

c.

One of Oldham's VICAR convictions is for the murder of Malachi Wilson, Jonathan Wilson's brother. After Gills shot at Wilson's friends, Wilson fled Flint. Gills called him and threatened that, if he did not return to face Gills, Gills would kill Malachi. Months later, Oldham spotted Malachi on Murda Ville's turf. At Gills's request, Oldham ran up to the SUV Malachi was sitting in, opened the door, and started shooting. Malachi ran, but Oldham chased him down and shot him in the head three times, execution-style.

Oldham contends that he killed Malachi because Gills asked him to, not because the gang's code demanded it. Perhaps Oldham was an exceedingly loyal friend to Gills. But no matter how loyal, people generally do not commit murder at a friend's say-so. *See United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996). A jury could therefore find that Oldham had another motive—the fear of losing standing in Murda Ville if he let Malachi go free.

Oldham's second VICAR conviction is for the attempted murder of Efrem Anderson. In February of 2010, a member of a biker gang called the Drifters shot Gills in the foot. Oldham and Jonathan Walker told fellow gang members that they planned to retaliate, and the next night, they drove to a nearby biker club. In the parking lot, they ran into Anderson, who was walking from the club to his car. Anderson pulled a gun on them, ordered them to leave, and then drove off himself. Oldham and Walker thought—mistakenly—that Anderson was a Drifter. They hoped he would return, so they waited for him in the parking lot and, when he came back minutes later, Oldham shot him three times, once in the head.

Oldham contends that there is insufficient proof that he had a gang-related motive. But Oldham went to the club to retaliate against a rival gang that had shot Gills. And once there, he was personally threatened by Anderson. Thus, if Oldham had failed to retaliate, he would have

broken the gang's code twice over. Moreover, after the shooting, the Drifters and Murda Ville negotiated a ceasefire. Oldham bragged about scaring the rival into the truce, which is circumstantial evidence that he had a gang-related purpose all along. *Cf. Whitten*, 610 F.3d at 180 (after-the-fact boasting about a murder is circumstantial evidence that the defendant committed the crime to increase his standing in the gang). Thus, there is sufficient evidence to support Oldham's VICAR convictions.

d.

Jatimothy Walker's VICAR conviction is for the murder of Marion Hardy. Hardy ran into Walker on the street, and the two men argued. Walker then stormed off, returning minutes later with his brother, Jonathan. The Walkers confronted Hardy, who raised his fists to fight. But the brothers pulled out their guns, and, while taunting Hardy, shot him repeatedly. As Hardy bled out, Jonathan delivered a final shot to his head at point-blank range.

Jatimothy Walker contends that he killed Hardy simply because he was angry. But Hardy's only sins were bumping Walker and exchanging a few cross words with him afterward. Those acts, a jury could find, would not have made Walker angry enough to kill. *See Hackett*, 762 F.3d at 500. The more plausible explanation is that Walker killed Hardy to send a message—that Walker (and by extension Murda Ville) would not tolerate any slight, no matter how trivial. In sum, Walker's disproportionate response to Hardy's disrespect would allow a jury to conclude that Walker had a VICAR purpose.

e.

Jonathan Walker's first VICAR conviction is for the murder of Hardy. Again, Walker shot Hardy in the head, at point-blank range, while Hardy was already bleeding out. That gratuitous violence, a jury could find, was a transparent attempt to emphasize how "hard"

Walker was so as to raise his standing in the gang. The evidence was sufficient that Walker had a gang-related purpose.

Walker's second VICAR conviction is for the attempted murder of Alonzo Golfin—a member of T Hood, Murda Ville's biggest rival. One day, Walker saw Golfin in Murda Ville territory. Walker quickly retrieved a gun, returned to where he had seen Golfin, and began shooting, hitting Golfin ten times. Like most gangs, Murda Ville expected its members to defend the gang's turf aggressively, especially against rival gangs. *See, e.g., United States v. Rubi-Gonzalez*, 311 F. App'x 483, 486 (2d Cir. 2009). If Walker had ignored Golfin and other gang members found out, he likely would have lost standing. That is evidence enough to conclude that Walker had a VICAR purpose.

## B.

Three defendants argue that the district court erred by retaining or dismissing jurors. We review those decisions for an abuse of discretion. *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984) (retaining jurors); *United States v. Cantu*, 229 F.3d 544, 550 (6th Cir. 2000) (dismissing jurors).

### 1.

Two weeks into trial, jurors told the district court about several instances of potential jury tampering. Four jurors reported that, while they were driving home from the courthouse one evening, they spotted cars that they thought were following them. Two of the jurors identified the drivers as people they had seen sitting in the courtroom gallery. Several other jurors told the court that, through the window of the jury room, they had seen people loitering in the jurors' parking lot. To the jurors, the people appeared to be recording jurors' license plate numbers.

When jurors make reports like those, the district court must "hold a hearing to determine whether the incident[s] complained of" prejudiced the defendants. *Remmer v. United States*, 347 U.S. 227, 230 (1954). The court cannot assume prejudice just because jurors have been "placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Nor may the court dismiss as "inherently suspect" jurors' assurances that they can remain impartial. *Id.* at 217 n.7. Instead, the defendant must prove "actual bias"—which means that, if jurors say they can be fair and the court finds them credible, the defendant must rebut the jurors' assurances with circumstantial evidence of partiality. *Pennell*, 737 F.2d at 532-34.

Here, the district court held a *Remmer* hearing and questioned each sitting and alternate juror about the potential tampering. Fourteen of them said that they could remain impartial. The other two equivocated about whether they could be fair. The court dismissed those two—both sitting jurors—and replaced them with alternates.

According to the defendants, there were three problems with how the district court handled the potential jury tampering. First, the court dismissed the two jurors after closing arguments, rather than immediately after the *Remmer* hearing. The defendants say that might have prejudiced them because the two jurors might have shared their concerns with the other fourteen, thereby tainting the entire jury. After the *Remmer* hearing, the defendants did not object to the two jurors continuing to serve, so we review only for plain error. *United States v. Maxwell*, 160 F.3d 1071, 1076 (6th Cir. 1998). An error is plain only if it is "clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). And the defendants have not pointed to any case that requires a district court to dismiss potentially biased jurors immediately after a *Remmer* hearing. That is reason enough to reject the defendants' contention. Moreover, the district court instructed the two jurors not to discuss the potential tampering with the other

fourteen. There is no evidence that the jurors ignored that instruction. The defendants have therefore failed to prove actual bias. *Maxwell*, 160 F.3d at 1077.

Next, the defendants contend that the district court should not have accepted the other fourteen jurors' assurances of impartiality. But we give great weight to such assurances. When examining jurors, the district court has an opportunity to assess their demeanor. And if after doing so the court finds the jurors to be credible, we will be hard pressed to find otherwise based on a cold record. *See Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

The defendants therefore needed to rebut the jurors' assurances with compelling evidence of partiality. To that end, the defendants point to three factors that they say prove bias. First, several jurors said expressly that they thought the people responsible for the tampering were friends or associates of the defendants. Second, the defendants were accused of violent gang crimes, so threats coming from their associates would likely seem quite credible. Third, jurors told the court that they were worried about the threats, and they acted differently because of them; indeed, one juror said that he had been varying his routes home from court so as to throw off anyone potentially following him.

We rejected a challenge on similar facts in *United States v. Zelinka*, 862 F.2d 92 (6th Cir. 1988). There, the defendant was charged with a drug conspiracy. *Id.* at 93. Mid-trial, someone "who appeared to be associated with [the defendant]" threatened a group of jurors in the courthouse hallway. *Id.* The district court questioned the jurors about the incident, and several said that they were frightened, with one admitting that "she had been having nightmares since the trial began[.]" *Id.* Thus, like this case, *Zelinka* featured a defendant who committed a gang-related crime, an associate who had made a threat on the defendant's behalf, and jurors who admitted to being frightened by the threat. Yet we held that the district court did not abuse its

discretion by relying upon the jurors' assurances that they could be impartial. *Id*. at 96. We reach the same decision here.

Finally, the defendants argue that the district court should have questioned two jurors more thoroughly, despite their assurances of impartiality. A day before the *Remmer* hearing, a juror complained that the others were "talking too much" and "airing out their problems" in the jury room. The "problems" they were discussing, however, were personal issues—not the alleged jury tampering. Thus, the district court did not need to ask the juror additional questions about the alleged tampering. Several days after the *Remmer* hearing, another juror said that she had been followed home, which she found "a little stressful." But again, where a juror says that she is frightened but can remain impartial, a district court can allow her to remain on the jury, and need not question her further. *Zelinka*, 862 F.2d at 93, 96. In sum, the district court did not abuse its discretion in handling the alleged jury tampering.

2.

The defendants also argue that the district court should not have dismissed a juror for lying during voir dire. The jury questionnaire asked potential jurors whether any of their friends or family members had been "accused of, investigated for, arrested for, or charged with a crime." The juror at issue checked "no," and then, during voir dire, attested that her form was accurate. But mid-trial, the court discovered—and the juror confirmed—that her parents had been imprisoned for murder and her brother imprisoned for drug offenses. The juror claimed that she had simply missed the question on her form. But another question asked whether she knew anyone "involved with gangs [or] drug sales." She answered by providing several friends' names, but not her brother's.

-15-

A district court can dismiss a juror for "reasonable cause." *Cantu*, 229 F.3d at 550. Reasonable cause exists where a juror's answers during voir dire are inaccurate—even if her mistakes are honest ones. *See United States v. Daniels*, 528 F.2d 705, 709-710 (6th Cir. 1976). Here, the inaccuracies appeared intentional, so the district court had even more reason to dismiss the juror.

The defendants offer two responses. First, Jatimothy Walker asserts that, when the district court examined the juror, she swore that she could be impartial. The court took other jurors at their word, Walker says, so the court should have done the same with this juror. But this juror had not been truthful on her questionnaire, so the court had good reason to doubt her claim to impartiality. Second, Oldham asserts that the court should have removed the juror immediately after learning that she had lied, rather than waiting until after closing arguments. But again, Oldham cannot prove that the court's decision resulted in any "actual bias." *Pennell*, 737 F.2d at 532. Thus, the district court did not abuse its discretion.

## C.

Three defendants argue that the district court should have tried them separately from their co-defendants. We review the denial of a motion to sever for an abuse of discretion. *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014). If evidence is admissible against one defendant but not another, a district court may try them separately. *United States v. Soto*, 794 F.3d 635, 656 (6th Cir. 2015). But the court is not required to do so unless the evidence will cause "compelling, specific, and actual prejudice." *Unites States v. Medlock*, 792 F.3d 700, 711 (6th Cir. 2015). A district court can typically cure prejudice with a limiting instruction that the evidence can be used against only one of the defendants. *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

1.

Oldham argues that, because he was tried with Gills and Norwood, the jury heard evidence that it would not have heard if he had been tried separately. Specifically, the Government introduced a recorded phone call between Gills and another Murda Ville member, in which they discussed moving younger members "to the frontline" of the gang. The Government also introduced a call between Norwood and Charles Orr, in which they discussed their mutual disdain for "snitches." Finally, a detective testified that he interviewed Norwood, who admitted that Murda Ville was a gang, that it protected its territory through violence, and that he was a member.

Gills's statements were admissible against Oldham. Statements made by a defendant's coconspirator "during and in furtherance of the conspiracy" are admissible against the defendant. Fed. R. Evid. 801(d)(2)(E). Gills's statements were about the gang's ongoing dealings. And they furthered the gang's purposes, helping to ensure that the gang would have the manpower to protect its turf. Thus, Gills's statements cannot have prejudiced Oldham.

Norwood's statements were not admissible against Oldham under 801(d)(2)(E). *See United States v. Smith*, 746 F.2d 1183, 1185 (6th Cir. 1984) (confessions do not further a conspiracy). But the district court recognized as much, and instructed the jurors that they should consider the statements only when evaluating Norwood's guilt. Moreover, even without Norwood's statements, the jury still could have convicted Oldham. Oldham concedes that the only element the statements helped prove was the existence of a RICO enterprise. Oldham's Br. at 53-54. And as discussed above, former gang members testified about Murda Ville's purposes, cooperative efforts, and longevity. Thus, Oldham was not prejudiced by being tried with Gills and Norwood.

2.

Jonathan Walker argues that, because he was tried with Gills, the jury heard inflammatory raps that Gills wrote while he was in prison. But like Oldham, Walker concedes that the only element those raps helped prove was the existence of the enterprise. Jonathan Walker's Br. at 38. The former gang members' testimony is sufficient proof of that element, so Walker was not prejudiced by Gills's raps.

3.

Finally, Jatimothy Walker argues that, because he was tried with his brother, the jury heard Jonathan's confession to the Hardy murder, which implicated Jatimothy. In a trial with multiple defendants, the Confrontation Clause prohibits the Government from introducing a defendant's confession in all but two circumstances: where the confessing defendant testifies, or where the confession does not implicate any co-defendant. *Cruz v. New York*, 481 U.S. 186, 190 (1987). A confession does not implicate a co-defendant where the confession takes on significance "only when linked with evidence introduced later at trial." *Richardson v. Marsh*, 481 U.S. 200, 208 (1987). Here, Jonathan Walker told the police that he had been involved in Hardy's murder. But he said nothing about his brother. Instead, his confession incriminated Jatimothy only when linked with another witness's testimony that the brothers had been together that night. Thus, per *Richardson*, the district court could admit the confession, so long as the court instructed the jury not to consider the confession against Jatimothy. *Id.* at 211. The court did so, and thus severance was not necessary.

D.

Three defendants argue that the district court improperly admitted evidence against them. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Ray*, 803 F.3d 244, 258 (6th Cir. 2015).

1.

Norwood argues that the district court should not have admitted evidence that he murdered a man named Omar Bashir. Federal Rule of Evidence 404(b) prohibits the Government from using evidence of uncharged crimes "to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character." The Government can use uncharged crimes "for any other purpose." *United States v. Tasis*, 696 F.3d 623, 627 (6th Cir. 2012). Thus, uncharged crimes can be admitted when they are directly probative of "an essential element of the crime." *United States v. Johnson*, 803 F.3d 279, 283 (6th Cir. 2015).

Here, the Government introduced evidence of the Bashir murder to prove that Norwood committed (and thus agreed to commit) two acts of racketeering—an "essential element" of a RICO conspiracy charge. *Id.* Norwood responds that the indictment does not list the Bashir murder as an overt act in furtherance of the conspiracy. But the Government can prove racketeering acts that it does not list in the indictment. *United States v. Rios*, 830 F.3d 403, 427 (6th Cir. 2016). Indeed, the Government need not list *any* racketeering acts in the indictment. *Id.* Thus, evidence of the Bashir murder was admissible against Norwood.

2.

Jatimothy Walker argues that, during jury instructions, the district court improperly disclosed that Walker was convicted of manslaughter in state court. But the district court did no

such thing. True, the court told the jury that "some of the defendants [had been] previously convicted of some of the same conduct" they were charged with here. But the court was referring to several defendants' state drug convictions, which had been admitted earlier. Walker's manslaughter conviction was never admitted, and the court did not mention it while instructing the jury. Walker's claim is meritless.

3.

Finally, Jonathan Walker argues that the district court erred by admitting statements that he made during a proffer session with the Government. Before the proffer, Walker and the Government agreed that "no statement made by" Walker "during the proffer discussion [would] be offered against" him at trial. But the agreement required Walker to "make a complete and truthful statement [about] the matters under investigation." And if the Government doubted Walker's candor, then the agreement also required him to take a polygraph examination "to verify . . . [his] statement." Six months before trial, prosecutors told Walker's lawyer that they thought Walker had lied during his proffer session. They asked Walker to sit for a polygraph, but he refused.

The Government may introduce a defendant's proffer statements against him if he materially breaches the proffer agreement. *United States v. Fitch*, 964 F.2d 571, 574-75 (6th Cir. 1992). A breach is material if it deprives the Government of "the benefit of its bargain." *Id.* at 575. Here, Walker agreed to provide statements that could be verified by polygraph examination. His refusal to take the examination therefore deprived the Government of the benefit it had contracted for. Given that Walker's breach was material, the district court did not abuse its discretion by admitting his statements.

Moreover, any error would have been harmless. A witness saw Walker shoot Hardy. And another witness testified that Walker admitted to shooting Anderson and Golfin. That was more than enough evidence to convict Walker.

E.

The defendants' remaining challenges are insubstantial.

1.

Jonathan Walker argues that prosecuting him for the murder of Marion Hardy violated the Double Jeopardy Clause because he had already been convicted of that crime in Michigan state court. Double Jeopardy "does not apply to suits by separate sovereigns, even if both are criminal suits for the same offense." *United States v. Mardis*, 600 F.3d 693, 696 (6th Cir. 2010) (internal citation and quotation marks omitted). The only potential exception to that rule is for "sham prosecutions"—suits brought by one sovereign just "because the [other] told it to do so." *United States v. Djoumessi*, 538 F.3d 547, 550 (6th Cir. 2008). Walker says the exception applies here because federal and state law enforcement investigated the murder together. But that "everyday" level of cooperation does not establish that the federal government was "merely a tool" of the State of Michigan. *Id.* Walker's claim fails.

2.

Jatimothy Walker argues that the district court should have held a hearing to investigate whether his trial counsel was constitutionally ineffective. Generally, a defendant is entitled to a hearing on whether his lawyer gave him effective assistance. *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007). But the proper time for that hearing is after appeal, when a defendant collaterally attacks his conviction under 28 U.S.C. § 2255. *See United States v.*

*Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012). Thus, the district court did not err by refusing to investigate Walker's claim.

3.

Norwood argues that his sentence violates the Sixth Amendment because the jury did not find facts "that increase[d] the penalty for [his] crime beyond the prescribed statutory maximum[.]" *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). For a RICO offense, the maximum sentence is generally 20 years. 18 U.S.C. § 1963(a). But if a RICO "violation is based on a racketeering activity for which the maximum penalty includes life imprisonment"—e.g., murder—then the maximum sentence is life. *Id.* Thus, for a defendant to receive a life sentence, a jury must find beyond a reasonable doubt that his RICO violation is "based on" a murder. *United States v. Nagi*, 541 F. App'x 556, 576 (6th Cir. 2013). Here, the jury did just that. The special verdict form asked the jury whether, "[w]ith respect to Count One"—the RICO conspiracy count—they found that Norwood had murdered Parker. The jury checked yes. That satisfies *Apprendi.*

4.

Gills argues that the district court should have instructed the jury on accessory liability. We review the court's refusal to give a requested instruction for an abuse of discretion. *United States v. LaVictor*, 848 F.3d 428, 453-54 (6th Cir. 2017). As noted above, Gills's defense to the Orr murder was that he did not know his passengers were planning to shoot until they started doing so. If true, Gills would be an accessory after the fact, not an aider and abettor. *Compare* 18 U.S.C. § 2 and § 3. And the jurors seemed to struggle with the distinction between the two offenses, asking the court to clarify whether a person could aid and abet without advance knowledge that a crime was going to be committed. When the jurors made that inquiry, Gills

says, the court should have instructed them on accessory-after-the-fact liability. But the court responded adequately to the jury's question, rightly stating that, to aid and abet, a person must form an intent to facilitate the crime "before completion of the crime." Thus, the court did not abuse its discretion by refusing to give Gills's requested instruction.

5.

Gills also argues that, when the district court sentenced him, it miscalculated his criminal-history score by factoring in a state drug conviction that was "invalid." Gills's Br. at 36. Specifically, Gills contends that the conviction was unconstitutional because the drugs were seized in violation of the Fourth Amendment. But at sentencing, a district court may discount a state conviction in only three circumstances: where a federal statute authorizes the district court to do so, where a state court has declared the conviction invalid, or where the defendant was denied his right to counsel in the case resulting in the conviction. *United States v. Aguilar-Diaz*, 626 F.3d 265, 270 (6th Cir. 2010). None of those exceptions apply here.

6.

Finally, Gills argues that the district court failed to explain his sentence, and failed to consider the disparity between his sentence and those of his gangmates. But the court's explanation was sufficient, and the disparity was warranted given that Gills had attempted to kill at least five people. Gills's final challenges fail.

\* \* \*

The district court's judgment is affirmed.