**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0107n.06

**Nos. 16-1517/1538**

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | **FILED**<br>Mar 02, 2018<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| EVAN JOHNSON and RAMIAH JEFFERSON, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

**BEFORE:    GUY, GIBBONS, and COOK, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge**.    After a month-long jury trial, Evan Johnson and Ramiah Jefferson were convicted of RICO conspiracy in violation of 18 U.S.C. § 1962(d) and possession of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c). In a special verdict, the jury also found that each had agreed and intended that at least one other conspirator would commit a racketeering act of robbery, enabling the district court to increase their sentences beyond the twenty-year statutory maximum. Both were sentenced to 300 months in prison for the RICO conspiracy charge and 60 months in prison for the firearms charge, to be served consecutively. They each raise several issues on appeal, none of which have merit. Therefore, we affirm their convictions and sentences.

I.

A.

Jefferson and Johnson's convictions arose out of their membership and participation in the Bounty Hunter Bloods gang, a Detroit gang associated with the original Bounty Hunters from Los Angeles, California. From roughly 25 initial members in 2004, the gang grew to around 500 members by 2010 and became one of the largest gangs in Detroit. Its colors were red, green, and tan. Members could be initiated in one of three ways. First, a potential member could undergo a "blood-in," where he or she would be required to hold a red bandanna and fight another member (or members) without dropping the bandanna. Alternatively, someone could get "blessed in," meaning that a high-ranking member (often a relative) could bring him or her into the gang without the new member having to endure a beating. Finally, females could also get "sexed in" by having intercourse with high-ranking members. Upon initiation, new members received literature containing the gang's by-laws and other information.

The Bounty Hunters had a hierarchical structure. Entry-level members were called "soldiers." The next rank was "head soldier," followed by lieutenant, head lieutenant, third capo, second capo, first capo, and young gangster/general ("YG"). At the top of the hierarchy were "original gangsters," or "OGs." YGs and OGs were responsible for calling meetings and directing criminal activity, and lower-ranking members were expected to follow higher-ranking members' orders. All Bounty Hunters were required to support other members in fights and criminal activity. Members who committed infractions, such as failing to know the by-laws, attend meetings, or take orders from higher-ups, were "violated"—beaten, shot, or stabbed.

Members could move up in rank, as well as show their loyalty to the Bounty Hunters, by "putting in work." "Putting in work" included: "tagging" places with Bounty Hunter graffiti;

committing robberies, home invasions, carjackings, and drive-by shootings; and fighting with rival gangs. When members generated money from their "work," they were expected to give some of it "to the pot." This "pot money"—essentially gang members' dues—was used to buy drugs and guns (also called "burners"), as well as to support Bounty Hunters who were incarcerated. Pot money was collected at meetings, which the gang held around once a month. In addition to meetings, members communicated with each other via cell phones and social media, often posting about their roles in the gang and discussing drug trafficking or firearms.

The Bounty Hunters shared guns, often storing them in other members' homes and commonly purchasing guns from each other. One Bounty Hunter testified that he could get a firearm from someone in the gang "whenever [he] wanted . . . ." DE 489, Trial Tr., Page ID 5937. The guns were usually stored at the homes of lower-ranking members because the gang believed the police were less likely to search such members' homes. Members frequently used these guns when they "put in work" committing robberies, carjackings, home invasions, or shootings.

Finally, Bounty Hunter members had "Blood names," or nicknames. Some members "earned" their names, while other members' nicknames were simply bestowed upon them when they joined. Johnson was known as "Unkle Murda," "Ev," or "Big Ev." Jefferson was known as "Nightmare," "Rio," or "B-Dubb Deuce."

B.

The final superseding indictment alleged seventy-three overt acts taken by various Bounty Hunters in furtherance of the conspiracy. At trial, the government produced extensive evidence of these overt acts, but this opinion will only discuss the crimes pertinent to the issues raised by the appellants.

In its case, the government focused particularly on two separate murders—the murder of Marquise Robinson and the murder of Courtney Meeks. Robinson's murder stemmed from a rival gang's assault on Bounty Hunter David Gay at a bus stop. Robinson had been present during the attack and, although he did not participate, he failed to intervene. Unable to locate the rival gang that actually perpetrated the attack, Gay and another Bounty Hunter member, Jayjuan Watts, selected Robinson as the target for their revenge. On February 4, 2009, Gay and Watts called Robinson and lured him to a house under the pretense of buying marijuana from him. Although Gay was supposed to be the one to pull the trigger, he hesitated, and Watts shot and killed Robinson.

Meeks's murder occurred on February 26, 2014, arising out of a carjacking in the parking lot of the CVS where Meeks worked as a security guard. Rineta Woodward was in the CVS parking lot in a car with her cousin's six-year-old son. Someone approached the car door on Woodward's side and opened it, holding a gun; he ordered her to get out of the car and she fled into the CVS with the child. As Woodward was running into the CVS, Meeks ran past her out of the store in an apparent attempt to stop or apprehend the perpetrators. Soon after Meeks ran outside, however, he was shot and killed. Jamare Rucker, a Bounty Hunter, and Jeremy Jackson were subsequently arrested and charged with Meeks's homicide.

In addition to testimony about the foregoing homicides, the government produced abundant evidence of other violent crimes committed by Bounty Hunter members. To name but a few examples: Two Bounty Hunters broke into Anthony Donald's home in Oak Park, beat him with a pistol, and robbed him. Larry Bachelor was robbed at gunpoint by two men, one of whom was Bounty Hunter Antonio Anthony. Jack Baum was carjacked at gunpoint, and at least one of

the perpetrators was Jamar McHenry, a Bounty Hunter. And former Bounty Hunter Drakkar Cunningham testified that he participated in a drive-by shooting of rival gang members.

C.

The government also presented evidence of the defendant-appellants' leadership roles within the gang. Both Jefferson and Johnson were founding members of the Detroit Bounty Hunters. Cunningham testified that both appellants achieved the rank of YG while he was a member of the gang, and that he saw Jefferson get promoted to OG status in late 2008 or early 2009. Watts confirmed that Jefferson later became the leader of the Detroit Bounty Hunters. Johnson also identified himself on Facebook in certain messages as "YG" or "OYG."

Due to their leadership positions, both Jefferson and Johnson were somewhat difficult to track. Lower-ranking members had to follow a "chain of command" in order to gain an audience with Jefferson. DE 485, Trial Tr., Page ID 5271–72. Antwuan Council, a confidential informant and government witness, testified that Jefferson was "like a ghost in the neighborhood," although Council sometimes saw Jefferson at parties. *Id.* at 5232. Watts saw Jefferson and Johnson at certain meetings, but testified that their attendance was "rare" because "they're supposed to be staying out of sight unless there was a mandatory meeting or something that's serious." *Id.* at 5284–86. Staying out of the "limelight" enabled them to evade police attention. *Id.* at 5286.

Despite their concerns with evading the police, however, Jefferson and Johnson were by no means invisible. Watts testified that Jefferson was present at Watts's blood-in. Cunningham testified that he saw Jefferson two to three times per week and would often discuss Bounty Hunter business with him. Cunningham only saw Johnson in person about five times, but he communicated with him over social media. Marcus Harvey, another former Bounty Hunter, testified that both Jefferson and Johnson directed lower-ranking members. Harvey further

testified that he was present at a meeting led by Johnson, Jefferson, and another high-ranking gang member where they discussed violence between the Bounty Hunters and a rival gang, the AGs.

The government also presented evidence showing Jefferson's and Johnson's awareness and support of the Bounty Hunters' criminal activity. Watts testified that after he informed Johnson about the attack on Gay, Johnson told Watts to "do what [you] do best, get the job done." DE 486, Trial Tr., Page ID 5332. Watts further testified that what he "did best" was "assaulting people, making sure that [if] anything happens to the family, to get the job done." *Id.* at 5333. When he communicated his difficulties locating the rival gang who committed the assault to Jefferson, Jefferson encouraged him to "get the next closest person . . . that was at the assault, who was Mr. Robinson." *Id.* at 5350. After Watts and Gay were arrested for Robinson's murder, Johnson instructed others on Facebook to take down all Bounty Hunter-related posts.

After the CVS carjacking and homicide, Johnson called Rucker several times. Two days after the crime, Johnson received a text saying, "This is Richie [Rucker's nickname]" and providing a new phone number. DE 491, Trial Tr., Page ID 6289, 6302. Johnson responded with, "All right. Love you, little bro." *Id.* On March 5, 2014, the day Rucker was arrested, Johnson received a text from someone else that said, "Dog, you seen that shit with Richie?" *Id.* at 6304–05. Johnson replied, "Yeah, I already knew." *Id.* at 6305. The other person responded, "Of course. Of course, you did. LOL." *Id.* Johnson also had screenshots from Rucker's Facebook page on his cell phone. *Id.* at 6306–08. Further, Harvey testified that he knew that Jefferson had loaned or given firearms to Rucker, and that Harvey knew Rucker had committed crimes involving firearms.

At trial, the government used Facebook messages to establish Johnson's role in providing guns to other gang members. In one message, Johnson wrote to an unidentified user, "Dat nigga, Black, say he got a handheld for dat lick." DE 488, Trial Tr., Page ID 5898. The other user responded, "'Nuf said. Bring it to me, big bro, and I got another one, too." *Id.* Another message from Johnson stated, "My bro got a 44 mag blue steel for 500 and he got a Mac 11 for 500." DE 489, Trial Tr., Page ID 6127. And in response to another user's question, "Who got a burner for sale," Johnson asked, "Watt kind you want?" and offered to contact someone for the user. *Id.* at 6128. On that same date, Johnson offered a "Nina for 200 fresh out da box," to which another unidentified user responded, "Do it got any bullets?" *Id.*

### D.

On March 20, 2014, ATF Agent Earl Douglas Robinson executed an arrest warrant for Johnson. The arresting officers conducted a security sweep of the apartment in which he had been arrested and found two spent shell casings and two rounds of live ammunition on a shelf in the bedroom closet. Also on March 20, 2014, Agent Doak Dyer executed the arrest warrant for Jefferson. Jefferson was found in a residence with a marijuana grow operation in the basement, marijuana plants in the garage, and three firearms. While performing a security sweep, police also found a cell phone, which Jefferson stated belonged to him. Agent Joseph Nether obtained a search warrant for the phone (as well as for the other defendants' phones), and gave the phones to another agent to conduct a forensic download. From the phones, Agent Nether was able to obtain text messages, social media chats, video content, email addresses, call history, and contacts.

Jefferson and Johnson, along with seven other Bounty Hunters, were indicted by a federal grand jury on March 5, 2014. The indictment charged Jefferson and Johnson each with one

count of RICO conspiracy and one count of possession of a firearm in furtherance of a crime of violence. In a third superseding indictment filed on March 4, 2015, the government added two Notices of Acts with Enhanced Sentencing for Jefferson and Johnson—one alleging that they "knowingly and intentionally conspired to commit acts involving murder" in violation of Michigan state law, and the other alleging that they "did conspire to commit acts involving robbery and, in the process, possessed a dangerous weapon" or threatened the use of a dangerous weapon in violation of Michigan state law. DE 152, Third Superseding Indictment, Page ID 494–95.

## E.

Johnson filed a pretrial motion to strike his nickname "Unkle Murda" from the indictment and to exclude reference to it at trial, arguing that it would unduly prejudice the jury in violation of Federal Rule of Evidence 403. Because he was also known as "Ev" or "Big Ev," among the Bounty Hunters, Johnson argued that the "Unkle Murda" nickname was neither necessary nor relevant to identifying him at trial. The district court granted the motion in part and denied the motion in part, agreeing that the alias should be removed from the indictment but permitting the government to "refer to aliases at trial when relevant to identifying the respective Defendant." DE 238, Order, Page ID 1172.

Jefferson filed a pretrial motion to suppress the fruits of the forensic examination of his cell phone, arguing that the search warrant for the phone was not based on probable cause because the affidavit in support of the warrant did not properly describe a nexus between the cell phone and the alleged criminal activity. Johnson and two other defendants joined the motion.

After a hearing,[1] the district court denied the motion to suppress. It found that the affidavit did provide the magistrate judge with a sufficient basis on which to find probable cause to search Jefferson's phone. The court further held that even if the warrant did lack probable cause, Agent Nether's reliance on it fell within the good faith exception to the exclusionary rule.

Jefferson also filed a motion in limine to limit the government's use of evidence to support the allegations in the indictment's notices of acts with enhanced sentencing, arguing that the notices failed to identify specific alleged acts of murder or robbery, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Johnson joined in Jefferson's motion. The district court denied the motion.

After a month-long trial, the jury convicted Jefferson and Johnson of one count of RICO conspiracy in violation of 18 U.S.C. § 1962(d) and one count of possession of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c). In a special verdict, the jury also found that each had "agre[ed] and intend[ed] that at least one other conspirator would commit a racketeering act of robbery." DE 367, Verdict Form, Page ID 3046–47. However, the jury found both Jefferson and Johnson not guilty of "agree[ing] and intend[ing] that at least one other conspirator would commit a racketeering act of first-degree murder." *Id.*

Jefferson filed a motion for judgment of acquittal, or in the alternative, a motion for a new trial, which Johnson joined. Raising similar versions of the arguments they brought in their joint motion for judgment of acquittal at the close of the government's case, the defendants each raised sufficiency of the evidence challenges, and Jefferson challenged both the constitutionality of the RICO statute as applied to him and the propriety of the jury instructions. The district court denied their motions. Both were sentenced to 300 months in prison for the RICO conspiracy

---

[1] Jefferson's brief states that the district court denied Jefferson's motion without an evidentiary hearing. However, in its opinion and order denying the motion, the court states that it "held a hearing on this motion on May 27, 2015." DE 240, Op. and Order, Page ID 1182.

charge and 60 months in prison for the firearms charge, to be served consecutively. They now raise several challenges to their convictions and sentences, none of which are meritorious. We therefore affirm the district court.

## II.

First, Johnson argues that the district court improperly allowed the government to use his nickname "Unkle Murda" at trial. Johnson objected to the use of his nickname on Rule 403 grounds. *See* FED. R. EVID. 403 (allowing a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice"). We typically review a district court's evidentiary rulings under the abuse of discretion standard, reversing "only where the 'abuse of discretion has caused more than harmless error.'" *United States v. Fisher*, 648 F.3d 442, 449 (6th Cir. 2011) (quoting *United States v. Johnson*, 440 F.3d 832, 847 (6th Cir. 2006)). The government has argued that Johnson waived his objections below and that we should review only for plain error. However, because we find that the district court did not abuse its discretion in allowing the government to refer to Johnson as "Unkle Murda" a limited number of times during the trial, it is not necessary to address whether the more stringent plain error standard applies.

As an initial matter, this court generally "disfavor[s] the use of aliases in indictments and at trial, and permit[s] their use only when they are relevant to identify the defendant." *United States v. Williams*, 158 F. App'x 651, 654 (6th Cir. 2005) (citing *United States v. Wilkerson*, 456 F.2d 57, 59 (6th Cir. 1972)). The district court's order complied with this general rule—it ordered the government to strike "Unkle Murda" from the indictment and permitted it to "refer to aliases at trial when *relevant* to identifying the respective Defendant." DE 238, Order, Page ID 1172 (emphasis added). Therefore, the only issue is whether the district court abused its

discretion by allowing the government to refer to Johnson as "Unkle Murda" at times during the trial.

Johnson argues that his case is similar to the Second Circuit case *United States v. Farmer*. In *Farmer*, the defendant was convicted of murder and attempted murder, but the Second Circuit vacated his conviction for attempted murder and ordered a new trial because of the government's "abuse" of Farmer's nickname "Murder." 583 F.3d 131, 135 (2d Cir. 2009). Likewise, Johnson claims, the government abused his nickname "Unkle Murda" at trial, meriting a reversal of his conviction and a new trial.

However, the facts of *Farmer* depart from the facts of Johnson's case in several significant ways. First, the district court in that case denied Farmer's motion to strike his alias from the indictment, unlike the district court here. *Id.* at 139. Second, the government in *Farmer* used the defendant's nickname "in its questions and dozens of times in argument to the jury." *Id.* at 140. The government referred to the defendant as "Murder," during opening statements, and "nearly thirty times" during closing statements. *Id.* at 144. Here, the "Unkle Murda" nickname was mentioned around thirty times throughout the *entire* month-long trial. The government did not use it all during opening statements, and only six times during closing arguments. Finally, and perhaps most importantly, the jury in *Farmer* convicted the defendant of murder and attempted murder. *Id.* at 135. In contrast, the jury here found Johnson *not guilty* of the RICO sentencing enhancement for conspiracy to commit murder. That fact is nearly fatal to Johnson's argument that the government's use of his "Unkle Murda" nickname "was so incredibly prejudicial that a fair trial was impossible." Johnson's Br. at 23.

The government generally used the "Unkle Murda" nickname appropriately. It elicited testimony from a few witnesses that Johnson was known as "Unkle Murda," and in some cases,

Johnson referred to himself as "Unkle Murda" on social media exhibits the government brought as evidence. There is only one incident where the government may have repeated the nickname too often:

> Q. All right. What did you discuss, if anything, with Unkle Murda?
> [Lawyer objects and court instructs government to rephrase the question.]
> Q. Did you refer to Ev as another name?
> A. Unkle Murda.
> Q. Okay. Did you contact Unkle Murda?
> A. Yes.
> Q. What did Unkle Murda tell you?

DE 486, Trial Tr., Page ID 5332. This repetition of the "Unkle Murda" nickname was irrelevant to identifying Johnson. Assuming the impropriety of this use of the nickname, one instance of such use over the course of a month-long trial—especially when the jury acquitted Johnson of the murder sentencing enhancement—was not so prejudicial as to require a new trial, considering the other evidence presented regarding Johnson's involvement in the Bounty Hunters. *Cf. Wilkerson*, 456 F.2d at 59 ("[I]n view of the strength of the evidence against the defendants, we hold that neither the error with respect to [the appellant's] alias nor the prejudicial effect of the Government's references to all the aliases warrants reversal here.").

Further, significant evidence introduced at trial supported Johnson's conviction for RICO conspiracy. Former Bounty Hunters testified that Johnson had a leadership role in the gang, and Johnson referred to himself as "OYG" on social media. Investigators also found photos and videos of Johnson wearing red, the Bounty Hunters' primary color, and throwing up gang signals. Although sightings were somewhat infrequent, he was seen in person at Bounty Hunter meetings, and he communicated with other members. He also gave instructions to lower-ranking members. For example, after Robinson's murder, Johnson instructed others on Facebook to take down all Bounty Hunter-related posts. And his cell phone and social media records revealed that

he was actively involved with Rucker after the CVS carjacking and homicide. We therefore conclude that Johnson was not unduly prejudiced by the government's use of his nickname and the district court did not abuse its discretion.

### III.

Jefferson argues that the district court erroneously denied his motion to suppress evidence obtained from the search of his cell phone because the search warrant was issued without probable cause. In an appeal from a district court's denial of a motion to suppress, we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *United States v. Gill*, 685 F.3d 606, 609 (6th Cir. 2012). "A finding of probable cause is a legal conclusion we review *de novo*." *United States v. Bass*, 785 F.3d 1043, 1048 (6th Cir. 2015).

### A.

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause." U.S. CONST. amend XIV. The Supreme Court has found probable cause to be "a fluid concept" whose determination requires "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 232, 238 (1983). The Court has adopted a "totality-of-the-circumstances" test for probable cause determinations. *Id.* at 238. When reviewing a magistrate judge's determination of probable cause, we must accord it "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting *Gates*, 462 U.S. at 236). "This circuit has long held that an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *Id.*

The search warrant in this case was for eleven cell phones belonging to various Bounty Hunters or associates of Bounty Hunters, and Agent Nether attached an affidavit in support of the warrant. Jefferson argues that Agent Nether's affidavit did not include "particularized facts

concerning the Samsung phone [belonging to Jefferson] that could provide a substantial basis on which to conclude that evidence of criminal conduct could be found in its storage capacity." Jefferson Br. at 23. Therefore, Jefferson claims, the affidavit did not establish a nexus between the criminal conduct charged and Jefferson's cell phone.

Applying the Supreme Court's totality-of-the-circumstances inquiry and viewing the magistrate's determination of probable cause with the necessary deference, *see Gates*, 462 U.S. at 236–38, Agent Nether's affidavit was sufficient to establish probable cause to search Jefferson's phone. Contrary to Jefferson's argument, the affidavit does "establish a nexus between the place to be searched and the thing to be seized, such that there is a substantial basis to believe that the things to be seized will be found in the place searched." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010).

As the district court pointed out in its order denying Jefferson's motion to suppress, the facts of *United States v. Bass* are similar to the facts here. In *Bass*, a defendant's cell phone was seized when he was arrested; prior to the arrest, he had been seen typing into the phone. 785 F.3d 1043, 1046–47 (6th Cir. 2015). The officers obtained a warrant before searching the phone's contents, and the defendant argued that the affidavit supporting the warrant failed to establish probable cause. *Id.* at 1048. We disagreed, holding that the affidavit established probable cause and "contained sufficient detail to tie th[e] particular phone to [the defendant's] alleged criminal activity." *Id.* at 1049. We primarily relied on the statement in the affidavit "that Bass was suspected of crimes in which 'cell phones were frequently used by conspirators to text or call each other . . . .'" *Id.* We also noted that the defendant had been using the cell phone when the officers seized it incident to his arrest. *Id.* Like the affidavit in *Bass*, Agent Nether's affidavit asserts that Bounty Hunters used cell phones and computers "to communicate with

other members and associates, to plan specific acts of violence and other crimes, to discuss past criminal activity, and to further the goals of the gang." DE 162-2, Ex. A: Search Warrant and Affidavit, Page ID 588. Additionally, like the defendant in *Bass* who affirmatively linked himself to the cell phone by typing on it before it was seized, Jefferson admitted that the phone belonged to him.

Jefferson claims that the affidavit "literally has no facts connecting the Samsung phone to the allegations of criminal activity," aside from Agent Nether's statements about his experience investigating gang members. Jefferson Br. at 30. This statement is simply untrue. The affidavit states that at the residence where Jefferson and his phone were found, officers also found a marijuana grow operation and three firearms. Furthermore, the affidavit states that Jefferson— who told the police the phone was his—had been indicted for RICO conspiracy and possession of a firearm in furtherance of a crime of violence. *Libretti v. Woodson*, 600 F. App'x 367, 372 (6th Cir. 2015) ("A recent indictment may also factor into the probable cause determination."). In addition to the facts specifically connecting Jefferson and his cell phone to criminal activity, the affidavit also contained information about gang members' use of cell phones, based on Agent Nether's training and experience as a Special Agent with the ATF since 2001. *Cf. United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994) (Although it is not sufficient to conclusively establish probable cause, "an officer's 'training and experience' may be considered in determining probable cause.") (citations omitted).

Jefferson compares the facts of his case to those in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016). But that case is distinguishable. In *Brown*, the affidavit in support of a search warrant for the defendant's residence "contained no evidence that [the defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had

taken place there." *Brown*, 828 F.3d at 382. Thus, it did not establish the required nexus between the location to be searched—the defendant's residence—and the criminal activity—his suspected drug-dealing. *Id.* at 384. In contrast, Agent Nether's affidavit specifically linked Jefferson to the cell phone and to criminal gang activity. He was found in a residence with marijuana and firearms, and had already been indicted on RICO conspiracy charges. Those facts, together with Agent Nether's statements based on his training and experience, are sufficient to establish a nexus between Jefferson's phone and his suspected gang involvement.

B.

Even if the search warrant did not establish probable cause to search Jefferson's phone, the district court correctly held in the alternative that the good faith exception to the exclusionary rule applies. "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). In arguing that the exclusionary rule does not apply here, Jefferson correctly states the law but misstates the facts of his case. For instance, he attempts to contrast his case with *United States v. Carpenter*, where this court sitting *en banc* found an affidavit lacked probable cause but "was not totally lacking in facts connecting the residence to [illegal activity]," so the good-faith exception applied. 360 F.3d 591, 596 (6th Cir. 2004) (en banc). Jefferson argues that in contrast to *Carpenter*, in his case "there simply are no facts in the Affidavit to support an inference or a connection to allegations of criminal conduct." Jefferson Br. at 31. But as stated above, that is false. Jefferson had been indicted on RICO conspiracy and firearms charges. He was arrested in a residence with a marijuana grow operation and three firearms. Agent Nether's affidavit contained those facts, which support a

connection between Jefferson and criminal conduct. Therefore, the district court did not err in denying Jefferson's motion to suppress the evidence obtained from the cell phone.

IV.

Jefferson and Johnson each challenge their 18 U.S.C. § 924(c) convictions, but on different grounds. Johnson argues that there was insufficient evidence to support his conviction, while Jefferson's arguments pertain to the statute's definition of a "crime of violence." Neither argument is persuasive.

A.

Johnson claims that the evidence presented at trial did not adequately support his § 924(c) conviction for possessing a firearm in furtherance of a crime of violence, so the district court erred in denying his motion for acquittal on that count. We review a district court's denial of a Rule 29 motion for a judgment of acquittal based on sufficiency of the evidence *de novo*. "The Court must construe the evidence in the light most favorable to the government, and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Johnson argues that his § 924(c) conviction cannot stand for two reasons: first, there was insufficient evidence that he possessed a firearm, and second, the government failed to establish a nexus between the firearm possession and the RICO conspiracy. Although the government's evidence on this count was not abundant, it ultimately produced enough evidence for a rational trier of fact to conclude beyond a reasonable doubt that Johnson possessed a firearm in furtherance of the RICO conspiracy.

18 U.S.C. § 924(c) imposes a term of imprisonment for "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . ." The jury convicted Johnson of one count of "possession of a firearm in furtherance of a crime of violence." DE 367, Verdict, Page ID 3049. Johnson's conviction therefore must stand if a rational trier of fact could have found, beyond a reasonable doubt, either: that he possessed a firearm in furtherance of the RICO conspiracy, or that he aided and abetted another RICO conspirator in possessing a firearm in furtherance of the conspiracy. *See* 18 U.S.C. § 2 (treating as a principal offender a person who "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States).

The government had multiple avenues through which it could establish that Johnson "possessed" a firearm. "Possession may be 'either actual or constructive and it need not be exclusive but may be joint.'" *United States v. Paige*, 470 F.3d 603, 610 (6th Cir. 2006) (citing *United States v. Covert*, 117 F.3d 940, 948 (6th Cir. 1997)). Proof of actual possession requires evidence that the object was "in the immediate possession or control of the party," while proof of constructive possession requires evidence that the person "knowingly ha[d] the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973), *abrogated on other grounds by Scarborough v. United States*, 431 U.S. 563 (1977), *as recognized in United States v. White*, 679 F. App'x 426, 434 (6th Cir. 2017). Both can be proven through direct or circumstantial evidence. *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (en banc) (citing *Craven*, 478 F.2d at 1333).

The government's only evidence of actual possession consisted of the two spent shell casings and two rounds of live ammunition found in the bedroom closet of the apartment where

Johnson was arrested. As Johnson points out in his brief, we require more to prove "direct physical control" over the firearm. For example, in *United States v. Bailey*, we held that the presence of a loaded gun underneath the defendant's seat in a stolen car driven by the defendant was insufficient to prove actual possession. *Bailey*, 553 F.3d at 944. However, under the evidentiary standard for constructive possession laid out in cases like *Bailey*, the government did produce sufficient evidence that Johnson *constructively* possessed a firearm. *See, e.g.*, *United States v. Walker*, 734 F.3d 451, 456 (6th Cir. 2013) ("Our prior decisions show that the quantum of evidence necessary to overcome *Bailey* is minimal in both the actual and constructive possession contexts.").

In *Bailey*, we held that the presence of a gun underneath the defendant's seat, without more, could not prove that he constructively possessed the firearm. *Bailey*, 553 F.3d at 944–46. In Johnson's case, though, the government produced a great deal of circumstantial evidence beyond the shell casings and ammunition found in the apartment. The government presented several Facebook messages at trial where Johnson offered to provide firearms to other users. In one message, he offered "a handheld for dat lick"; in another he offered a "Nina for 200 fresh out da box"; and in yet another he stated, "My bro got a 44 mag blue steel for 500 and he got a Mac 11 for 500." DE 488, Trial Tr., Page ID 5898; DE 489, Trial Tr., Page ID 6127–28. Those messages tend to show that Johnson had "the power and intention at a given time to exercise dominion and control" over the firearms. *Craven*, 478 F.2d at 1333.

Johnson's second argument—that the government failed to prove a nexus between firearm possession and the RICO conspiracy—also fails. We have held that to prove that possession of a firearm was "in furtherance" of the predicate crime, the government must show "a specific nexus between the gun and the crime charged." *United States v. Mackey*, 265 F.3d

457, 462 (6th Cir. 2001). *Mackey* listed factors for determining whether the firearm was possessed in furtherance of the crime charged, which we have applied in subsequent cases: "(1) whether the firearm was loaded; (2) the type of firearm; (3) whether the weapon was stolen or legitimately possessed; (4) the type of [] activity conducted; and (5) the time and circumstances under which the gun was found." *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004) (citing *Mackey*, 265 F.3d at 462).

Because no actual firearm was discovered in Johnson's case, most of the *Mackey* factors cannot be applied here. The government acknowledges that "most cases rely on a multi-factor evaluation of circumstantial evidence to determine § 924(c)'s 'in furtherance' element," but argues that "witness testimony—by itself—can demonstrate that element." Gov't Br. at 70. To support its claim, the government cites the statement from the Judiciary Committee Report on § 924(c), which *Mackey* quoted: "The Committee believes that one way to clearly satisfy the 'in furtherance of' test would be additional witness testimony connecting [the defendant] more specifically with the firearm." *Mackey*, 265 F.3d at 462 (quoting H.R. REP. NO. 105-344). The government produced such testimony, along with additional evidence that would enable a rational factfinder to find a nexus between the firearms and the RICO conspiracy. The terminology in the Facebook messages indicated that the users corresponding with Jefferson about guns were fellow Bounty Hunters. For instance, in response to Johnson's offer of a handheld weapon, one user wrote "'Nuf said. Bring it to me, *big bro*, and I got another one, too." DE 488, Trial Tr., Page ID 5898 (emphasis added). Another message from Johnson stated, "My *bro* got a 44 mag blue steel for 500 and he got a Mac 11 for 500." DE 489, Trial Tr., Page ID 6127 (emphasis added). Witness testimony at trial indicated that Bounty Hunter members referred to each other as "family," and "brothers and sisters." There was also testimony at trial

that the Bounty Hunters routinely shared guns with one another and stored them in each other's homes. Additionally, Johnson offered "a handheld for dat *lick*," and testimony at trial showed a "lick" was slang for robbery. DE 484, Trial Tr., Page ID 5014; DE 488, Trial Tr., Page ID 5898. Thus, despite the absence of physical firearms, we conclude that the shell casing and ammunition, the Facebook messages, and the testimony about gun-sharing among the Bounty Hunters was sufficient for a rational factfinder to convict Johnson of violating § 924(c).

B.

Jefferson also challenges his 18 U.S.C. § 924(c) conviction, arguing that it should be reversed for one of two reasons: first, because the § 924(c)(3)(B) residual clause is unconstitutionally vague, or in the alternative, because RICO conspiracy is not a "crime of violence" within the meaning of the § 924(c)(3)(A) force clause. Jefferson concedes that he did not bring these arguments before the district court. Therefore, this court reviews them for plain error, *see United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008), and will only reverse Jefferson's conviction if the error is "plain" and "affects substantial rights." FED. R. CRIM. P. 52(b).

18 U.S.C. § 924(c) defines a "crime of violence" as "an offense that is a felony and—"

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Part (A) is referred to as the "force clause," while Part (B) is referred to as the "residual clause." *See, e.g.*, *United States v. Tibbs*, 685 F. App'x 456, 465 (6th Cir. 2017).

Jefferson's argument that the § 924(c) residual clause is unconstitutionally vague can be dispensed with quickly. As he acknowledges in his brief, this Circuit squarely held that 18

U.S.C. § 924(c)(3)(B) is not unconstitutionally vague in the published decision *United States v. Taylor*, 814 F.3d 340, 375–76 (6th Cir. 2016). "A panel of this court may not overturn binding precedent . . . ." *United States v. Elbe*, 774 F.3d 885, 891. Thus, *Taylor* forecloses Jefferson's argument. *Cf. United States v. Odum*, 2017 WL 6524022, at *5 (6th Cir. 2017).

Nor does Jefferson's other argument—that RICO conspiracy is not a crime of violence—have any merit. The government's brief correctly states that the plain error standard of review bars his claim. "An error is 'plain' when, at a minimum, it 'is clear under current law.'" *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). If there is "[a] lack of binding case law that answers the question presented," or if there is a circuit split on the issue, there can be no plain error. *Id.* Jefferson provides no binding case law to support his argument. Furthermore, at least two other circuit courts have rejected similar arguments. *See United States v. Scott*, 681 F. App'x 89, 95 (2d Cir. 2017) ("In our Circuit, a RICO offense is correctly treated as a 'crime of violence' when at least two of the RICO predicates that are found by the jury to have been committed are themselves 'crimes of violence.'"); *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) ("We have recognized that a conspiracy itself can be a separate crime of violence providing its own predicate or § 924(c)(1) liability.") (internal quotation marks omitted). In the absence of binding case law supporting his argument, and considering that two other circuits have rejected such a claim, using Jefferson's RICO conspiracy conviction as the predicate offense for his § 924(c) conviction was not plain error.

## V.

Both appellants challenge the language of the RICO sentence enhancement notice under *Apprendi v. New Jersey*, which held that "any fact that increases the penalty for a crime beyond

the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). They further argue that even if there was no *Apprendi* violation, the language in the special verdict form constituted a constructive amendment of the indictment. We review both constitutional challenges to a sentence and claims of constructive amendments *de novo*. *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008); *United States v. Crowell*, 493 F.3d 744, 750 (6th Cir. 2007).

## A.

The third superseding indictment included a Notice of Acts with Enhanced Sentencing that charged Jefferson and Johnson with conspiracy to commit robbery in violation of Michigan law. The jury's special verdict question asked whether Jefferson and Johnson were guilty of "agreeing and intending that at least one other conspirator would commit a racketeering act of robbery." DE 367, Verdict Form, Page ID 3046–47. Because the jury found them guilty of this sentencing enhancement for robbery, they were both ultimately sentenced to 25 years' imprisonment for the RICO conspiracy count—five years beyond the statutory maximum. *See* 18 U.S.C. § 1963(a) (RICO criminal penalties). Johnson and Jefferson argue that the language in the sentence enhancement notice did not require the jury to find the elements of a conspiracy to commit armed robbery in violation of Michigan law, so it violated *Apprendi*'s mandate that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. We find, however, that the sentence enhancement notice complied with *Apprendi*.

The RICO statute enhances the penalty for violating 18 U.S.C. § 1962 from 20 years to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment . . . ." 18 U.S.C. § 1963(a). Under *Apprendi*, then, the jury was only required

to find that defendant-appellants' § 1962 violation was "based on" a racketeering act of robbery. In *United States v. Gills*, which the government cites in its brief, we found that a special verdict form very similar to the one here satisfied *Apprendi*. 702 F. App'x 367, 384 (6th Cir. 2017). In *Gills*, "[t]he special verdict form asked the jury whether, '[w]ith respect to Count One'—the RICO conspiracy count—they found that [the defendant] had murdered [the victim]." *Id.* (second alteration in original). We held that the language satisfied *Apprendi* because it required the jury to "find beyond a reasonable doubt that [the defendant's] RICO violation [was] 'based on' a murder"—as required by the enhancement provision in § 1963. *Id.* Analogously, here the special verdict form asked the jury whether defendant-appellants were guilty of "agreeing and intending that at least one other conspirator would commit a racketeering act of robbery." DE 367, Verdict Form, Page ID 3046–47. The phrase "racketeering act of robbery" adequately required the jury to find that the robbery was related to, or based on, the RICO enterprise. The special verdict language therefore satisfies *Apprendi*, even though it does not list each element of Michigan's law on conspiracy to commit robbery.

B.

In the alternative, Jefferson and Johnson argue that the verdict form language amounted to a constructive amendment to the indictment, because the language used in the special verdict was not the same as the language in the indictment. A constructive amendment occurs when the language of the indictment is "in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003). There was no constructive amendment to the indictment here.

-24-

The third superseding indictment contained the following Notice of Acts with Enhanced Sentencing:

> From on or about June 23, 2007, through on or about the date of this indictment, in the Eastern District of Michigan, enterprise members RAMIAH JEFFERSON [and] EVAN ALEXANDER JOHNSON . . . did conspire to commit acts involving robbery and, in the process, possessed a dangerous weapon or an article used or fashioned in a manner to lead any person present to reasonably believe the article is a dangerous weapon, or represented orally or otherwise that he was in possession of a dangerous weapon, in violation of Michigan Compiled Laws, Sections 750.529, 750.89, and 750.157(a).

DE 152, Third Superseding Indictment, Page ID 495. The special verdict question asked the jury whether Jefferson and Johnson were guilty of "agreeing and intending that at least one other conspirator would commit a racketeering act of robbery." DE 367, Verdict Form, Page ID 3046–47. The fact that the language in the indictment differs from the language in the special verdict form does not, by itself, mean that there has been a constructive amendment to the indictment. The indictment charges Jefferson and Johnson with conspiring to commit acts involving robbery in violation of Michigan law, and the jury found them guilty of agreeing and intending that another conspirator would commit a racketeering act of robbery. Those are not two distinct offenses—a robbery in violation of Michigan law *is* a racketeering act of robbery.

Finally, the government correctly argues that any error in the verdict form was harmless. Where an element of the offense is omitted from the jury verdict form, this court will not overturn the conviction if it "is satisfied that . . . it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty despite the lack of an actual jury finding on that element.'" *Kuehne*, 547 F.3d at 681 (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)). Here, there was overwhelming evidence presented at trial that Bounty Hunters participated in robberies, home invasions, and carjackings; that Jefferson and Johnson gave orders to lower-ranking members that involved directing them to commit crimes; that they were aware of their

co-conspirators' criminal activities; and that they personally offered or supplied guns to other Bounty Hunters. Even had the special verdict contained identical language to that of the third superseding indictment, the jury would still have convicted Jefferson and Johnson.

## VI.

Lastly, Jefferson and Johnson argue that the district court erred in its Guidelines calculations. Objections to the district court's Guidelines calculations are reviewed for abuse of discretion, with its factual findings reviewed for clear error and its legal conclusions *de novo*. *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013). "Whether a co-conspirator's actions were reasonably foreseeable is a factual finding reviewed for clear error." *United States v. Dupree*, 323 F.3d 480, 490 (6th Cir. 2003).

§ 1B1.3 of the Sentencing Guidelines provides that a defendant's base offense level and specific offense characteristics "shall be determined on the basis of the following:

> (B) in the case of a jointly undertaken criminal activity . . . all acts and omissions that were—
> > (i) within the scope of the jointly undertaken criminal activity,
> > (ii) in furtherance of that criminal activity, and
> > (iii) reasonably foreseeable in connection with that criminal activity . . . .

U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a) (U.S. SENTENCING COMM'N 2016). The Pre-Sentence Report ("PSR") calculations, which the district court adopted in determining the defendants' total offense levels, included the Oak Park home invasion and the CVS carjacking and murder of Meeks in the base offense level calculations. The PSRs also recommended a four-level adjustment based on the defendants' leadership roles in the Bounty Hunters.

Jefferson and Johnson objected to the inclusion of those crimes at sentencing, arguing that they were not foreseeable. In accordance with Federal Rule of Criminal Procedure 32(c)(1),

the district court addressed the defendants' objections at their sentencing hearing. *See United States v. O'Malley*, 265 F.3d 353, 356 (6th Cir 2001) ("[Rule] 32(c)(1) requires the district court to make findings of fact regarding each controverted enhancement at the sentencing hearing.") The district court's findings were not clearly erroneous.

At Jefferson's hearing, the court found that "explicit evidence in the trial connects Mr. Jefferson" to both the Oak Park Robbery and the CVS carjacking. DE 508, Jefferson Sentencing Tr., Page ID 7076. At trial the government played a phone call that Shon Hargrove, one of the perpetrators of the Oak Park robbery, made to Jefferson while Hargrove was in jail. In the phone call, Jefferson alluded to having motivated Hargrove to commit the home invasion and robbery. There was also testimony that Jefferson provided guns to Rucker, the perpetrator of the CVS homicide, on several occasions. The court reasoned that "if you provide a loaded gun to someone, and then do it again, and then do it again, it's certainly foreseeable that at some point that gun is going to go off and somebody is going to get hurt, or worse." DE 508, Jefferson's Sentencing Tr., Page ID 7064.

In Johnson's case, there was extensive evidence of communications he had with Rucker after the CVS carjacking. Moreover, there was the following text message exchange between Johnson and another person:

> Question: "Dog, you seen that shit with Richie [Rucker's nickname]?"
> Johnson: "Yeah, I already knew.
> Response: "Of course. Of course, you did. LOL."

DE 491, Trial Tr., Page ID 6304–05. The court concluded that such evidence, plus the "broad" language of § 1B1.3(a) and the "witnesses who identified Mr. Johnson as one of the top, top echelon members of the Bounty Hunters," supported a finding of foreseeability. DE 507, Johnson Sentencing Transcript, Page ID 7013.

Considering the evidence presented at trial, therefore, the district court's foreseeability determinations were not clearly erroneous.

## VII.

For the foregoing reasons, we affirm the appellants' convictions and sentences.